THOMAS E. FRENCH et al., receivers, &c.,

*v.*

EDWARD A. ARMSTRONG.

[Decided January 26th, 1912.]

1. Defendant was president of a building and loan association, chairman of its executive committee, and its solicitor. It was the practice of the association on accepting an application for a loan to issue a check for the amount to defendant as its attorney, and he, on the conclusion of the transaction, would give his own check on a private bank account, in which the association's check had been deposited, to the borrower for the amount of the loan.—*Held*, that defendant thereby became a trustee of an express trust of the funds of the association so received and deposited.

19

2, Where defendant as president of a building and loan association received from it various sums of money to pay to borrowers on the completion of various transactions, he being chargeable therewith as a trustee, the burden was on him to show that the money was either paid over to the borrowers as contemplated or returned to the association, and, in case of his inability to do so, he was personally liable therefor.

3. Where the president of a building and loan association retained $10,000 received from it with which to make a loan to another after the negotiations for the loan had terminated without its having been made, and used such fund for more than eight years without paying any interest thereon to the association, he was chargeable with the amount so retained as a trustee with compound interest.

4. Where it was claimed that directors of a building and loan association had made certain *ultra vires* loans to persons not members, one of the directors, when sued alone on a different theory, could not, on the issue as framed, be held liable therefor, but such liability should be enforced in a suit to which all the directors implicated should be joined.

5. Where an attorney received money from his client which it was afterwards agreed should be applied to the attorney's claim for legal services, the attorney, when sued for an accounting, was entitled to a credit for the amount of his bill for services.

On bill (No. 2).

*Messrs. French, Bergen & Robbins, pro se.*

*Mr. Robert H. McCarter,* for the defendant.

STEVENS, V. C.

This is a bill filed by the receivers of the State Mutual Building and Loan Association against the defendant to recover moneys alleged to have been entrusted to him from time to time by the association to consummate loans made to its stockholders, and which, not having in fact been lent, were not returned to the company's treasury.

Mr. Armstrong was the president of the company, one of its directors, chairman of the executive committee of the board and its solicitor. The association was one of the largest of its kind in the state. Its money was lent either to its stockholders in the way that building and loan associations commonly lend, viz., by pledge of the association's stock fortified by other collateral, or to outsiders on simple bond and mortgage or other security.

The course of business was that the written applications of borrowers were presented to the executive committee, which met weekly, and if they approved, a check for the money to be lent was drawn to the order of E. A. Armstrong, attorney. He, or his office, then made the necessary searches and prepared the deeds or other instruments, and, if the title was satisfactory, paid over the money by giving his own check. The securities taken were returned by him to the association. The work in his office was done largely through a clerk and attorney named Shinn, who is dead. The secretary and general manager of the association, Fithian, is also dead, and so the testimony of the two witnesses, who of all others would have been most helpful, has been lost.

But while Shinn transacted a great deal of the business that passed through Armstrong's office, Mr. Armstrong himself was by no means a figurehead. He and Fithian were unquestionably the most active and influential of the officers of the association. While he did not conform, literally, to the requirement of the by-laws that he should have a desk at the association's office, and should, daily, at a certain hour, attend there (in the words of the by-law) "to oversee the business of the association," yet his office was just across the street and he regularly attended the meetings of the executive committee, which, as I have said, were held weekly, and at which most, if not all, the important business of the association was passed upon. He was required by the by-laws to sign all certificates of stock, drafts, orders, deeds, agreements and other instruments in writing, and he appears to have done so.

It seems to me that in view of the decisions to which I have referred in my opinion in the case of bill No. 1 (another suit against Mr. Armstrong, *ante p. 283*), and especially of *Williams* v. *McKay, 40 N. J. Eq. (13 Stew.) 189,* his liability was that of a trustee of an express trust. Counsel argue with much earnestness that because he received the money entrusted to him as solicitor or attorney, he is chargeable only in that character, and can be sued only at law where he may plead the statute of limitations. This argument is manifestly unsound. If, as solicitor, he was negligent; if he made an improper use of the moneys of the association; if he mingled them with his own, then, as president, it was

his duty to call himself to account. His failure to do so was a breach of trust for which, in case of loss, he is responsible as president. It will hardly be contended that as president he did not have actual notice of his defaults as solicitor. But even if he should be regarded as an agent he certainly, under the evidence, bore a fiduciary relationship to the association, whose president and executive committeeman he was, and the law is that "wherever a fiduciary relation exists between a principal and his agent the statute of limitations does not apply in favor of the latter" while the relationship continues. *Ev. Agency* *293*. The authorities cited in the case of bill No. 1 show that his liability as such can be enforced in this court.

Mr. Armstrong was, no doubt, engaged in many enterprises, but this made it the more incumbent on him to systematize his accounts and keep his various clients' moneys separate from his own. It is admitted that he kept no separate bank account for the association's money, and that he was very unbusinesslike. No charge of dishonesty, in the ordinary sense of that word, is either made or intimated, but it is clear that he often used the association's money for his own purposes, when it could not immediately be applied to the purpose for which it was confided to him.

With this general view of the situation, I proceed to consider the numerous specific charges of the bill. These charges, with one or two exceptions, are that Armstrong received moneys for loans to stockholders and others, approved by the executive committee, which for one reason or other were never consummated, and that he did not return or account for the money. Many of these charges are uncontested and the liability conceded. In explanation of this concession he says that his books and papers are lost or have been destroyed; that Mr. Shinn, his chief clerk, is dead, and that while he is obliged to admit the receipt of the money, he is without the means of discharging himself, either by showing its application to the purpose intended or its return. There was a bookkeeper and an assistant bookkeeper engaged in keeping the books. The gentlemen connected with the association were men of intelligence and business experience. There is not much reason to doubt that if the money had been so applied or

returned, the association's books would have shown it. No imputation has been cast upon the good faith of those who made entries in them.

There are five items on which there is a contest:

*First.* The Parker loan. On June 8th, 1896, Rebecca E. Parker made written application for a loan in her character as stockholder, offering certain houses and lots as security. The application, as first drawn, was for $2,500, but, by interlineation, this was changed to $4,660, and as additional security, she offered "the Dr. E. L. Smith premises, Overbrook." The loan was approved and a check of the association signed by Armstrong, president, and Fithian, secretary, dated June 19th, 1896, was made to the order of E. A. Armstrong, attorney, for $4,600. It was stated on the check that it was a "loan to R. E. Parker." It was deposited to the credit of E. A. Armstrong in the New Jersey Trust and Safe Deposit Company. At the time this check was made, Armstrong held in his own name the above-mentioned Smith premises. E. L. Smith had mortgaged them to the association in 1894. The mortgage had been foreclosed and the title taken in the name of Armstrong, who held it for the association at the time he received the above check. By indenture made and acknowledged June 12th, 1896, but not recorded until July 6th, 1896, Armstrong, for the consideration, as therein stated, of $2,500, conveyed the property to Rebecca E. Parker. On June 16th, 1896, Rebecca E. Parker and her husband gave a mortgage to the association to secure $4,600, covering, among other things, the Overbrook property, which was, as I think, simultaneously deeded to her. The mortgage recites that the Overbrook property is the same premises conveyed to Mrs. Parker by Armstrong, "by deed dated June 12th, 1896, and intended to be forthwith recorded." The mortgage was recorded on the day of its date. The books show that the association received the $4,600 mortgage, but do not show that it received the price of the land. It is admitted that the real consideration agreed to be given for the land was $2,100 and not $2,500.

Now, the transaction might have been closed in one of two ways. The delivery of the deed might have preceded the delivery of the mortgage and Mrs. Parker might have actually

paid the consideration in cash. This is the theory of the defence which suggests (but without any proof) that this cash was paid to some officer of the association other than Armstrong, who neglected to enter its receipt in the association's books. This theory is not only opposed to the usual course of business, and to the language of the papers, and to what we would, in the absence of proof, suppose to have taken place, but finds no support in the testimony of Mr. Armstrong himself. This is his evidence:

"*Q.* Did you ever have any of the balance that appeared. to be due on this Parker transaction?

"*A.* No. Parker never paid me a cent, and I am very sure *Parker never paid anything into the office, because Parker didn't pay.*"

The other and probable alternative is that the deed and mortgage were delivered simultaneously; that Armstrong paid the borrower $2,500 in cash and that the price of the property made up the residue of the $4,600 secured by the mortgage. That the deed bears date on June 12th, does not militate against this conclusion for it was not recorded until July 6th, and could have been delivered at any time during that interval. The mortgage being dated and recorded on June 16th, the deed was probably delivered on that day. This conclusion is, moreover, borne out by the letter written two months after by Parker, in which he says, "The consideration for this property was $2,100 and it was included in the $4,600 mortgage."

Now, it is ordinarily incumbent on a trustee charged with the receipt of money to show what he did with it. Armstrong is unable to prove that he returned this $2,100. He does not show a single fact which tends in that direction. No presumption of a return arises from his customary mode of doing business, for the evidence indicates not only a failure on his part to keep an account, but shows affirmatively and beyond all question that he did retain large sums of the company's money a long time after they should have been returned, and shows further a possible motive for this retention in the fact that he mingled the money with his own and used it as his own. But we have the further significant circumstance that this was one of the items entered

by the bookkeeper in the account designated "S. F. 253." This was a special account kept by Mr. Ware in the so-called Sinking Fund Loan Book, and it was designed, as he says, to answer the purpose of a memorandum for ready reference to such matters as remained unsettled in Judge Armstrong's hands after the time when, in the usual course of business, they should have been closed. The account was opened in May, 1900, by direction of Mr. Reeves, the assistant secretary, and appears to have been, in part, a transcript of an earlier record. In this account, Armstrong is, among other things, charged $2,100 in respect of the Parker transaction. Mr. Reeves says that while he does not remember that Armstrong examined the account in the book, yet his attention was called to it through statements and correspondence and verbal communications. On May 13th, 1901, Armstrong wrote Reeves as follows:

"The examiners called my attention to a memorandum, 'June 27, 1894, Van Booskirk, $700. * * * June 19, 1896. Smith house, $2,100.' * * * I know nothing about these matters. Can you enlighten me? They say they are charged in the S. F. loan charge to me," &c., &c.

It would appear probable from Mr. Reeves' testimony that such information as the association had was furnished, but obviously the transaction having passed through Armstrong's office its details were, or ought to have been, more thoroughly understood by Shinn and Armstrong than by Reeves. This correspondence appears to have had no result, and we have nothing more in writing until February, 1906, when Reeves wrote Armstrong:

"I enclose the statement you request. I think it contains some items you have questioned. Will you kindly mark such items or give me a list of them so I can investigate? Most of them were before my time."

If Armstrong replied it must have been verbally. Now, what is noteworthy is that Armstrong does not appear, at any time, to have denied liability out and out, but merely to have taken the position, "I know nothing about these matters." But how was it that he knew nothing? He had Shinn at hand, who, he says, knew all about them. How easy to have asked Shinn

to refer to his account or check book and ascertain whether he had given a check for the balance of the money. The fact that he did not, can only be accounted for on the supposition that he had, without keeping an account, so commingled the money of the association with his own that it had become a matter of difficulty to separate them and tell where the association's money had gone. In this situation it seems to me plain that even if there were more doubt as to whether he had failed to return the money than there seems to be, the negligent trustee should suffer a possible loss rather than the association. *Bohle* v. *Hasselbroch, 64 N. J. Eq. (19 Dick.) 334.*

*Second.* The Van Booskirk loan. The origin of this loan is found in the following extract from the minutes of the executive committee: "June 15th, 1894. App. John V. Booskirk, Collingswood,. $2,500 approved, provided he give his entire interest as security." On June 27th, 1894, a check for $2,500, signed by Armstrong, president, and Fithian, secretary, was drawn payable to the order of E. A. Armstrong, attorney. On the check was written "Loan to John V. Van Booskirk (Collingswood)." It appears that on July 12th, 1894, Van Booskirk made a mortgage for only $1,800 on an undivided half interest in three tracts, on which in September, 1894, he repaid to the association $300, and in November, 1894, $1,500. Armstrong appears to have given to the company no statement of what he did with the balance. A memorandum of this loan was, like Parker's, entered in the sinking fund loan account and Armstrong was therein charged with $700. His attention was called to this charge at the same time that it was called to the Parker charge, and it met with a like response. In his evidence, in answer to the question as to what information or knowledge he had of the matter, he replied: "I have none whatever. I have no recollection of any such matter being in the office, and no knowledge concerning it at all." As he admits receiving the $2,500 and fails to give any evidence or indication that he repaid the $700; as the item was called to his attention more than once when Shinn was alive and when it ought to have been easy for him to have shown the return of the money, if

it has been returned, it seems to me that here, too, he has failed to exonerate himself.

*Third.* The Brooks loan. While a great deal of evidence has been given in connection with this loan, the facts essential to a determination of the liability are neither obscure nor difficult of comprehension, however much some unessential particulars may be involved in doubt. On February 11th, 1897, Walter J. Brooks made a written application for a loan of $16,000 on property at Stone Harbor, a seaside resort. The loan was approved, and two days after a stock certificate for one hundred and sixty-six shares was issued to him and assigned to the association as collateral. Brooks was not the owner of the Stone Harbor property. It was owned by the Stone Harbor Improvement Company, which had, some time before, given a mortgage to secure $30,000. At the time of the application for the loan the mortgage appears to have been the property of Elizabeth Abbott, and had by her, or by her consent, been pledged as security for an indebtedness or claim then held by one Avil, for $12,500, or thereabouts. Brooks applied for a loan to enable him to redeem this mortgage, ostensibly at least, on behalf of his mother-in-law, Mrs. Abbott. On February 12th, 1897, Armstrong received from the association $15,600, the amount of the Brooks loan, minus the premium. He obtained legal tender notes to the amount of $12,500, and went with Brooks to Avil's office in Philadelphia to make a tender. The tender was refused, and for some reason or other, not disclosed, was held insufficient both in this court and on appeal when the mortgage was subsequently foreclosed. *Wright* v. *Stone Harbor Improvement Co., 69 N. J. Eq. (3 Robb.) 837.* After this refusal, Wright seems to have lost all interest in his application, which he practically abandoned. He did not receive any part of the money lent, and he did not make any payment on his stock.

Shortly after, Charles F. Abbott, husband of Elizabeth Abbott, died, and Samuel I. Abbott was appointed his executor or administrator. He, in March, 1897, made an application for a loan of $20,000, and this application, to the extent of $16,000, was approved by Fithian, but no further steps were taken to

consummate the transaction. No stock was issued, no security was given and no money was lent.

As I have already said, Armstrong had received $15,600 on account of the Brooks loan. He had tendered only $12,500. When the tender was refused he deposited the amount tendered in his own account. On November 10th, 1898, that is, one year and nine months after he received it, he opened what was called "The E. A. Armstrong special tender account" of $12,275, with the New Jersey Trust Company. Of this, $2,275 was a deposit of money and $10,000 was represented or secured by a note given by Armstrong to the company which bore interest at one per cent. Mr. Fowler, the then president, says, and his evidence is conceded to be correct:

"that the arrangement was that this deposit was made and if needed before the money was drawn, securities were to be deposited and that the account was marked that way when it was opened on the books."

It is obvious, therefore, that Armstrong did not put $12,275 of the association's money into the tender account, but only $2,275. He retained $10,000 in his own account, and as a substitute made the note for $10,000. The entry *appeared* to indicate that he had deposited $12,275, but the sum entered was not available until it had been secured by further collateral. In other words, it was a seeming tender account but not a real one. This account was continued until May 26th, 1905, when Armstrong closed it and returned the whole amount of it to the association. It thus appears that for more than eight years he had the use of $10,000 of the association's money without paying any interest for it to the association. Under these circumstances it would seem that the rule laid down by the court of appeals in *McKnight's Executors* v. *Walsh, 24 N. J. Eq. (9 C. E. Gr.) 498,* requires that he be charged compound interest for the money while retained. It is true that the trust company gave him a certificate of deposit which was shown to the officers of the association. But this certificate, while it might perhaps under some circumstances have estopped the trust company from denying that Armstrong had the money on

deposit, does not change the fact that he was using the association's money, and that he was doing it deliberately and intentionally for his own profit. It is questionable whether, under the proofs, he would have been justified in making even a proper deposit on behalf of a man who had practically abandoned his application, but no such deposit was, in fact, made. The transaction cannot be regarded as closed, for a part of the principal of the Brooks loan still remains to be accounted for.

This part is the difference between the amount agreed to be loaned ($15,600) and the amount tendered ($12,275). Armstrong used this for the benefit of the Stone Harbor Company without the formal authorization of the executive committee and without taking any obligation or security in the regular way. Whether Fithian and some of the others knew of it, is a matter in dispute. Whether they did or not, the use to which he applied the money was unjustifiable. Defendant's counsel seeks to excuse it in this way: He says the committee authorized the loan to Brooks. Abbott took the place of Brooks and the Stone Harbor Company was really Abbott, because the Abbott family owned eighty per cent. of the Stone Harbor Company's stock. This position is altogether untenable. In point of fact Abbott did not take the place of Brooks. He was not substituted as a stockholder and never himself, even in form, became the association's debtor. That Abbott was not identical with the Stone Harbor Corporation is too obvious for argument. This company, was, besides, on the verge of insolvency. Mr. Felton, the association's vice president, became its receiver on March 28th, 1899; Armstrong was employed as its counsel trying to save it, and he used the money that had been intended for Brooks to buy up the judgments and other claims against it.

With a view of protecting, as he says, the company's moneys thus used, Armstrong, on May 27th, 1898, took an assignment of a mortgage made by one Rummell to secure $7,275. Whether it was a sufficient security is another question in dispute, but irrelevant to this inquiry. He took it under the following resolution of the Stone Harbor Company:

"Whereas, information has been received by Hon. E. A. Armstrong, the company's counsel, that the application (the first application as I understand) for a receiver has been dismissed and that the injunction has been removed; Resolved, that the mortgage for $7,000 held by the company against the excursion house be assigned as collateral security for moneys advanced and services rendered by said Hon. E. A. Armstrong, and that the assignment be made this day."

This assignment was signed, sealed, acknowledged and delivered without inserting the name of the assignee. Whether it was retained by Armstrong, who now disclaims all personal interest in it, until after the failure of the association, or at once handed by him, as he insists, to the association, it is certain that the association's name, as assignee, was not inserted until after it had passed into the hands of the trustees appointed to wind it up. They then filled in the association's name and shortly afterward, repenting of their act, offered to give it back to him. As I understand Mr. Armstrong's position, it is that in taking this mortgage he took adequate security for the money of the association that he had irregularly used for the benefit of the Stone Harbor Company, while he was acting as counsel for that company. He does not pretend that the association by any formal act approved what he had done, or that they ever released their claim upon him for the money. This being so, it seems clear that having no authority to use the money as he did, he is under a legal obligation to return it. When he does so, he is entitled to whatever collateral the receivers hold.

*Fourth.* The Grimwood loan. Grimwood, whom Armstrong had represented in some litigation, applied for a loan of $25,000, and offered as security the bonds and stock of the Union Traction Company. Fithian, so Mr. Armstrong says, expressed himself as satisfied with the collateral but objected to lending so large a sum to a stranger without having some other persons stand security. It was, therefore, agreed that a loan of $15,000 should be made to Finn, Armstrong's clerk, who should appear on the books as the applying stockholder, to be secured by the personal obligation of Fithian, Burleigh and Armstrong himself, and that $10,000 should be lent out of the sinking fund account. All the money went to Grimwood. These gentlemen, as an in-

ducement to them to make the loan in this form, were to receive some stock of the traction company. The company failed and so did its successor, but a small sum was ultimately realized in the winding up. The $15,000, less the amount realized, was ultimately paid by Armstrong, and it is only the $10,000 loan that forms the subject of controversy now. As to it the question is whether the money was lent to Armstrong or to Grimwood. The minutes of the executive committee contain the following: "Sept. 10, 1897, Exec. Com. met with present Adams, Cassel-man, Coles & Fithian. App'n Rec'd viz.: S. F. Loans E. A. Armstrong Atty. C. $10,000." A check was, on September 21st, drawn "to the order of E. A. Armstrong Atty." He endorsed it as attorney and deposited it in the Security Trust Company, which gave him a draft on the Camden National Bank. This he endorsed "Pay to the order of Thomas Grimwood, E. A. Armstrong Attorney." There is no doubt but that Grimwood got the money. As collateral for the loan the association received a note of Grimwood for $5,000, payable to his own order, and endorsed by him; fifteen bonds of the Union Traction Company and some Union Traction stock. Why Grimwood did not give a note for $10,000 or two notes for $5,000 is not explained.

The bill charges as follows:

"Your orators further show and charge that the said Thomas Grim-wood never did apply to the said defendant as attorney for said associa-tion for said loan of ten thousand dollars, and that the making of said loan upon such collateral was *ultra vires* the association as said de-fendant well knew, and that said purported application was a pretext and fraud upon said association; that the sum of ten thousand dollars, or any part thereof, was not paid or advanced as a loan by said associa-tion through said attorney for Thomas Grimwood, but that the whole proceeds of said loan were taken and applied by said defendant to and for his own use and purpose, and that he holds said sum of ten thousand dollars in trust for said association and for your orators."

There is no evidence whatever that the association intended to make Armstrong its debtor. It took neither his promissory note nor his bond. The loan authorized was to him as attorney, the check was drawn to him as attorney, and on the very day he received it he gave Grimwood the money. Mr. Reeves, one of the

association's principal witnesses, with no bias toward Armstrong, says the loan was understood to be a loan to Grimwood and not to Armstrong. When the security was found to be nearly worthless, it was, after discussion, as Mr. Reeves says, by the members of the executive committee at their meetings, put into the suspense account. On cross-examination, Mr. Reeves was asked this question:

> "From your knowledge of the company would the loan have been put in the suspense account, as you have described it—practically written off as bad—would that have been done if the company looked upon Judge Armstrong as the borrower?"

His reply was, "It would not." There was no reason why it should have been, for Armstrong was able to pay it, and the committee were by no means dominated by him. Judge Gaskill's evidence shows that they had no hesitation in demanding collateral from him to secure money in his hands and that they got it. Armstrong's direct testimony that the money was not lent to him is borne out by all the other evidence on the subject.

But it is said that the transaction was *ultra vires,* in that, according to the by-laws, the funds could be loaned only to members. The statute in force at the time of the incorporation authorized the lending to members "or in such other ways as the constitution of the particular association shall provide." *Gen. Stat. p. 333* § *16.* The constitution of this company provided (section 10) that "provisions for loans, fines, transferring of stock and the like shall be made in the by-laws." The by-laws provided only for loans to members. This association seems to have had on hand very large amounts of money uninvested and not sought for by the members. Call loans were authorized by resolution and frequently made, and without objection. Whether the directors who authorized such loans of sums that would otherwise have remained idle, are, in case of loss, responsible, is an important question involving not Armstrong alone but the entire board. While it is true that the liability of directors is several as well as joint, it is also true that in a case of this sort it would be both proper and desirable that all who concurred in making loans of this character should be be-

fore the court. The case was tried on the theory that the true issue was whether Armstrong or Grimwood was the debtor. The defence was directed to that issue alone. If the bill had set forth the constitution and by-laws and had charged that no loans were authorized except to members, it is obvious that evidence. would have been given showing what the directors had resolved; . what the course of practice was; how uniform and long continued; and what the necessity for it. Little or no proof of that sort was given. I called attention to the difficulty on the argument and suggested . that the bill might be amended and the defendant given an opportunity to set up these matters in his answer and to put in further proof. The counsel for the receivers said that they would elect to stand upon the issue as framed. Under these circumstances, it seems to me that the question raised should, if at all, be litigated in another bill to which all standing in like case should be parties.

The same considerations will apply with even greater force to the question whether the collateral taken was such as ought to have been accepted. Here the gentlemen primarily liable would probably be the individuals entrusted with the duty of passing upon the sufficiency of the security. On the issue, as made, I think complainants have failed.

*Fifth.* The Larzalere money. The defendant admits receiving this money and says that by arrangement between himself and Fithian it was agreed that it be retained to pay certain indebtedness of the association to him. This indebtedness consisted of charges made against it for legal business transacted. The bill for this business is produced. I do not see why credit should not be given to Armstrong's statement and why the adjustment thus made should not stand. The association has not been injured. The mere fact that proper entries were not made upon the books by Fithian, or under his direction, ought not to disturb it.

It is difficult to decide on what principal interest should be charged, except in the case of the $10,000, where, as I have said, it must be compounded, for the reason that there is clear proof of intentional appropriation. There is no such evidence as to the other money that came into the hands of Mr. Armstrong. In the

Stone Harbor Company's case it affirmatively appears that he used the money, as he says he did, on behalf of the association. Its use, in the way he used it, was irregular and unauthorized, but he did not use it for himself. In the case of the Parker and Van Booskirk loans, there is no direct proof of any user. All that appears is that he received the money and that he has not fully accounted for it. It is quite possible that he or Shinn may have put the money into his bank account, but this is mere inference or conjecture. Armstrong says he knows nothing about it. The executive committee gave him a wide latitude in reference to keeping funds of the association. They obtained collateral security for such money as they thought he had held too long (not, as I understand, including the money in question), but did not demand its immediate return. In other words, they treated it as a loan on collateral to Armstrong himself.

The evidence shows negligence on Armstrong's part and perhaps on the part of the officers of the association, but not intentional appropriation. If he was negligent in not repaying it, the association was negligent in not demanding it. In *Mayor of Berwick* v. *Murray, 7 De G. M. & G. 518,* the chancellor distinguishes between impropriety of conduct and intentional appropriation. In the *McKnight Case, supra,* the legacy which ought to have been invested for the *cestui que trust,* was used in the trustee's business. Under the circumstances, it seems to me that what equity requires is that Armstrong be charged with the legal rate of interest, uncompounded. *Ashurst* v. *Potter, 29 N. J. Eq.* (2 Stew.) 625, 648; 1 Lew. Trusts *341. Of course, on payment he will be entitled to the collateral.